United States District Court
Southern District of Indiana
Indianapolis Division

FILED

Joseph Hartsock,
    Plaintiff,

v,

The GEO Group, Inc, et al,
    Defendants,

Case no.

DEC 31 2019

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

1 : 19 -CV- 5 0 7 3 TWP -MJD

## Verified Civil Rights Complaint

### I. Introduction:

This is a civil rights action under 42 U.S.C. §1983, wherein the Plaintiff, Joseph Hartsock, a state prisoner alleges that defendants, while acting under color of state law violated Plaintiff's constitutional rights under the U.S. Constitution, Amendments 1, 8, and 14, by attaching an adverse price to Plaintiff's 1st Amendment right to make grievances about conditions of confinement by filing a Major Conduct violation against Plaintiff, violating his Due Process rights at the Disciplinary Hearing, failing to remedy the violations after learning of the constitutional violations, file false, libelous and retaliatory conduct report and work evaluations, terminating Plaintiff from his high paying clerk job, then not reinstating job or prioritizing a job hire, for Plaintiff after Indiana Department of Correction overturned and dismissed the retaliatory Major Conduct violation upon learning of the constitutional violations as mandated by I.D.O.C., Plaintiff maintains state torts based on the same, of breach of contract, negligence, intentional infliction of emotional distress, libel, and slander, as well as RFRA, (I.C.34-13-9)

### II. Parties:

1. Plaintiff, Joseph Hartsock, I.D.O.C. #966460 ("Hartsock")

page #1 of #27

is currently and was at all times relevant herein, is a U.S. Citizen and state prisoner confined at New Castle Correctional Facility in Henry County, Indiana.

2. Defendant, The GEO Group, Inc, ("GEO") is a private for-profit corporation that is contracted by Indiana Department of Correction ("I.D.O.C.") and/or State of Indiana to oversee the safety and security operations, including following I.D.O.C. policies and procedures at N.C.C.F. It is located at: One Park Place, Suite #700, 821 NW 53rd Street, Boca Raton, FL 33487.

3. Defendants Mark Sevier, Scott Fitch, Jennifer French, C/o Fowler Roy Davis, Richey Adams, T. Thompson, A. Petry, Mrs. Rutledge, Jennifer McGrath, Shane Nelson, E. Ndiaye, Misty M. Cecil, Mrs. Pentecost are/were employed by GEO, to perform various task (including I.D.O.C. policies that are in place to stop or curb 1st Amendment retaliation, etc.) at NCCF. They are located at: 1000 Van Nuys Road, New Castle, IN 47362.

4. Defendants were acting under color of state law at all times relevant to the claim herein.

## III. Jurisdiction & Venue:

5. This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed by the 1st, 8th, and 14th Amendments to the U.S. Constitution.

6. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343.

7. This court has supplemental jurisdiction over the Plaintiff's state tort law claims under 28 U.S.C. § 1367.

page #2 of #27

8. Plaintiff claims for injunctive relief are authorized by Rule 65 of the Federal Rules of Civil Procedure,

9. This cause of action arose in the Southern District of Indiana, Therefore venue is proper under 28 U.S.C. §1391.

IV. Previous Lawsuits By Plaintiff:

10. Plaintiff has filed NO other lawsuits dealing with the same facts included in this action or otherwise relating to his imprisonment,

V. Exhaustion:

11. Plaintiff has exhausted all administrative remedies available to him with respect to all claims.

VI. Statement of Claim:

12. At all relevant times herein defendants were "persons" for purpose of 42 U.S.C. §1983 and acted under color of law to deprive Plaintiff of his constitutional and statutory rights, as set forth

VII. Factual Allegations:

13. In August 2013, Plaintiff was transferred to N.C.C.F. by I.D.O.C. for continued assignment to Protective Custody

14. The Protective Custody assignment was based on Vice Lord gang members and their associates continued attempts to cause Plaintiff serious physical harm and/or death because Plaintiff informed Internal Affairs about their attempts to traffick drugs through Plaintiff's legal mail, and subsequently the Vice Lord's drugs being confiscated.

15. Prior to July 2019, Plaintiff filed six (6) 42 U.S.C. § 1983 civil rights complaints against GEO and/or I.D.O.C. None were dismissed as frivolous or malicious

page #3 of #27

16. Since Plaintiff's August 2, 2013 arrival at N.C.C.F. but prior to July 2019, Plaintiff, when asked for help, has provided good faith advice and/or legal strategy, to at least thirty-five (35) inmates in filing or preparing their motions/lawsuits and to at least one hundred (100) inmates, in filing their own grievances against GEO and/or I.D.O.C.

17. Since Plaintiff's arrival at N.C.C.F. but prior to July 2019, Plaintiff has arguably filed more grievances about condition of confinement than any other inmate at N.C.C.F. during the same six (6) year time frame regarding violations of federal, state and local laws, rules, and ordinances, including but not limited to violations of N.C.C.F, GEO, or I.D.O.C policies. See Gomez v. Randle, 680 F.3d 859, 866 (7ᵗʰ Cir. 2012) ("A prisoner has a First Amendment right to make grievances about conditions of confinement") (quoting Watkins v. Kasper, 599 F.3d 791, 798 (7ᵗʰ Cir. 2010)).

18. On August 28, 2019 after Defendants Adams, McGrath, Nelson, and others told Plaintiff they were "removing [Plaintiff] from Protective Custody", highly likely resulting in Plaintiff being placed in close proximity to Vice Lord gang members or their associates who want to cause Plaintiff serious physical injury or death. Plaintiff and his attorney Christopher Myers communicated the life and death situation these prison staff members were putting Plaintiff in to their supervisors including but not limited to Warden Sevier and IDOC commissioner Carter. These communications were protected by the 1ˢᵗ Amendment.

19. In July 2019 Plaintiff began work at the prison as a clerk. The job was a class A pay job, the highest class

pay job available in Plaintiff's housing area. The job paid Plaintiff approximately $35.00 a month in state pay. This is approximately the second highest paying job in Plaintiff's housing unit.

20. The clerk job described in paragraph #19 above included but was not limited to job duties of distributing Library and/or Law Library Request forms, aiding inmates who request assistance for it with help filling out Library/Law Library Request forms, pre-printed legal forms provided by N.C.C.F. Law Library, inmate sign-ups and assistance of use of the Lexis Nexus legal research computer. Inmates and most staff refer to the job as the Law Clerk job.

## (i) DEFENDANTS VIOLATE RIGHTS BELOW

21. As the M4 Law Clerk Plaintiff regularly assisted or worked with N.C.C.F. main Library/Law Library staff when they were in M4 to expedite communications between inmates and the Library/Law Library staff each Friday, usually.

### (A) Defendants Interference With Access To Courts

22. Prior to being hired as the Law Clerk Plaintiff made/filed numerous complaints about Law Library staff not picking up/processing legal mail and oppressing Protective Custody inmates' access in general to Law Library services that general population inmates were not experiencing. Many of these complaints were against Defendant Misty M. Cecil.

23. The Law Library does not always visit M-Dorm each week. Prison operations vary because of safety and security so Plaintiff has learned not to wait until the last

page #5 of #27

minute to turn outgoing legal mail into the Law Library otherwise Plaintiff's deadlines could be missed, N.C.C.F. policy requires a weekly visit, though.

24. Thursday September 5, 2019 was the last day Plaintiff was allowed to perform M4 Law Clerk job duties.

25. For reasons unknown to Plaintiff, Plaintiff was not released from his cell on Friday September 6, 2019 to perform his Law Clerk job duties or assist the Library or Law Library staff when they entered Plaintiff's housing Unit M4 which was not normal as Law Clerk's are regularly let out to help when the Law Library is in a housing unit.

26. Plaintiff's name, Doc #, and cell location was on the S.T.A.N.D. Unit Sign-Up Sheet along with five (5) other inmates to show that these individuals needed to been seen by Library or Law Library Staff on Friday August 6, 2019. Under the comments section of this sign up sheet next to plaintiff's name it stated, "legal mail/notary/deadline". (See Exhibit "A") These sign up sheets are regularly used by Law Library Staff to identify who needs Library or Law Library services that particular week.

27. On September 6, 2019 approximately 7:40AM (Leisure Library) Mrs. Pentecost and C/O Fowler walked Plaintiff's housing range (M4 Top range). I heard C/O Fowler and Pentecost ask if 216 had "leisure library books to turn in." Pentecost then stopped at Plaintiff's cell (M4-215) and stated "Leisure Library." Plaintiff's cellmate who was standing at the front of the cell of M4-215, Steven Kidd I.D.O.C. #206278 stated, "My cellie needs to see Law Library." Plaintiff heard Pentecost

page # 6 of #27

state, "Law Library will be around," At that time Plaintiff walked to the front of cell M4-215 and stated to Pentecost, "I have legal mail to turn in," C/O Fowler then stated, "We are only taking leisure library books," A few minutes passed and Pentecost and Fowler again walked the top range of M4 when they were at Plaintiff's cell M4-215 Plaintiff stated to Pentecost, "I have legal mail to turn in, it's deadline legal mail," C/O Fowler then stated, "We are only taking leisure library books," Plaintiff then stated to Pentecost, "I need to see Mrs, Cecil then," (See Exhibit "B," First Sworn Affidavit Of Robert Bell ¶¶¶ 3-4)

(B) GEO Fails To Train Employees About Legal Duties To Avoid Violation Of Rights

(C) Plaintiff Verbal Petition To Officers

28. A few minutes passed from the interaction described in paragraph #27 above when Plaintiff's cell door opened for Kidd and Hartsock to retrieve our commissary that the commissary just delivered. The commissary bags were three (3) feet in front of cell M4-215, (See Exhibit "B" ¶5)

29. While still holding onto Plaintiff's cell door while Plaintiff's cellmate pulled the commissary in our cell, Plaintiff lodged a verbal informal complaint with Defendant Ndiaye, Plaintiff has lodged numerous other verbal informal complaints with Defendant Ndiaye as Ndiaye is a Correctional Sergeant and a supervisor of Plaintiff's housing Unit, Ndiaye has never ordered, inferred, or asked Plaintiff not to make informal complaints to Ndiaye, prior to this date September 6, 2019, has stated to Plaintiff it is part of his job to try to resolve complaints,"

30. The acts and omissions of Ndiaye described in

page # 7 of #27

paragraph #29 strongly suggested it was permissable for Plaintiff to lodge verbal informal complaints with Ndiaye.

31. Plaintiff stated to Ndiaye, "I have deadline legal mail to turn in and the staff will not take it." Pentecost who was standing in front of cell #216 did not deny, object, or state any differently concerning this statement to Ndiaye. At that time Defendant Ndiaye stated "Lock back in". Plaintiff turned around walk into my cell and as Defendant Cecil walked by Plaintiff stated "I have deadline legal mail I need to turn in Mrs. Cecil." Misty Cecil did not stop at cell 215 or 216 and walked down the stairs.

32. Plaintiff then notified M4's inmate Pod Representative Kevin Campbel I. D.O.C. #          (herein after "Pod Rep Campbell") to let staff know I still have, "deadline legal mail to turn in." Pod Rep Campbell confirmed to me that he, "notified both C/o Fowler and Sgt. Ndiaye, "I don't know what else I can do."

33. Approximately five (5) minutes passed and Plaintiff was summoned to the multipurpose room by Defendant Richey Adams to receive INCOMING legal mail. During this Legal Mail Pass interaction with Defendant Adams who is M.Dorm' housing units highest custody supervisor and Sgt. Ndiaye's supervisor Plaintiff verbally informed Defendant Adams of the incidents described in paragraphes #25 - #32 above. Defendant Adams then asked Ndiaye to take Plaintiff to the Law Library staff who were still in M.Dorm so they could take Plaintiffs' legal mail.

34. Plaintiff's good faith verbal informal resolution attempts to both Sgt. Ndiaye and Capt. Adams described in paragraphs #29 - #33 above were in compliance with I.D.O.C. policy 00-02-301 and protected by the First Amendment.

35. The Seventh Circuit has, "decline[d] to hold that legitimate complaints lose their protected status simply because they are spoken. Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." Pearson V. Welborn, 471 F.3d 732, 741 (7th Cir. 2006)

36. Only after Plaintiff's sixth attempt did Defendant Cecil finally take possession of Plaintiff's deadline legal mail in the hallway in front of Plaintiff's housing Unit MY. During this exchange Defendant Cecil stated to Plaintiff, "You walked right by me downstairs when you got your commissary you could have given me your mail then." At that time Plaintiff stated to Cecil, "I was never downstairs. I live up stairs." Cecil then stated "Well then you walked by me downstairs when you came out to work." Plaintiff then stated to Cecil, "I never came out to work would you like Ndiaye to verify that. It would be physically impossible for me to have done what you are saying. By you and Pentecost not taking my mail which is deadline legal mail you are creating barriers, hindering, and interfering with my ability to access the courts and I would prefer you do not violate my constitutional rights like that.

37. Following the exchange described in

page # 9  of # 27

paragraph #36 above Sgt. Ndiaye authored a Major Conduct report Class B-252 "Interfering With Staff" against Plaintiff, (See Exhibit "C")

38. Following the exchange described in paragraph #36 above Defendant Cecil authored a negative job/work evaluation against Plaintiff requesting Plaintiff be "reclassed out of lying (sic) and interfering with staff". (See Exhibit "D")

39. The Report of Conduct described in paragraph #36 above states, "On the above date and approx. time I Sgt. Ndiaye reviewed camera footage for a claim from the above offender (Joseph Hartsock) stating that the POD ofc. denied him to turn in his legal mail that was due to the Library Staff and the Library staff never came to his cell door to talk with him. Upon my review of footage I witness the Library Staff going to the above offender cell multiple times starting at 0746 hours The Library staff was in M4 approx 30 minutes. By investigating in the above offender claim, I had to stop supervising blood draws and cell clean ups for M-Unit. The above offender was notified of this conduct report. End of Report." (See Exhibit "C")

40. I.D.O.C. policy 02-04-101, V. B. (4) requires staff who prepare a State Form 39590, Report of Conduct to have the staff person's immediate supervisor to "review the Report Of Conduct to ensure that the alleged offense is in accordance with the charged offense", "or does not support the charged offense, the supervisor shall return the report to the reporting staff person with instructions to correct the report"... "If the REPORT OF CONDUCT is satisfactory, the supervisor shall sign the appropriate box on the form, advising the reporting staff person, and forward the report of Conduct to the Disciplinary Review Officer,"

41. On September 6, 2019 Captain Richey Adams was Sgt. E. Ndiaye's supervisor. Defendant Adams reviewed the relevant conduct report described in paragraphs 37-39 above, signed his name and dated the document Sept 6, 2019 at 1245PM, indicating under IDOC policy 02-04-101 described in paragraph #40 above, his approval of Ndiaye's conduct report. (See Exhibit "C")

42. I.D.O.C. policy 00-02-301 Offender Grievance Process Section II. Policy statement states in part, "It is expected that offender complaints will be resolved informally by staff attempting to meet and discuss the complaints prior to the offender filing a written grievance." (See Exhibit "E" page 1)

43. I.D.O.C. policy 00-02-301 Offender Grievance Process Section III. Definitions: defines "Reprisal" as, "Any act or threat of action against anyone for the use of, or participation in, the offender grievance process" (See Exhibit "E" page #2)

44. I.D.O.C. policy 00-02-301 Offender Grievance Process Section V. Use of Offender Grievance Process Without Fear of Reprisal" states, "Reprisal against an offender for filing an informal complaint or formal grievance is strictly prohibited. The prohibited reprisal includes, but is not limited to disciplinary action against the offender for filing a grievance." (See Exhibit "E" page #6)

45. I.D.O.C. policy 00-02-301 Offender Grievance Process Section X, "Informal Resolution of Complaint" states, "It is the intent of the Department to resolve all offender complaints and concerns as quickly and informally as possible. Both staff and offenders are to attempt to resolve matters through open and courteous discussions before turning to the grievance process. Before filing a grievance, an offender is required to

resolve a complaint informally and provide evidence ... of the attempt, The offender may do this by discussing the complaint with the staff member responsible for the situation or, if there is no such single person, with the person who is in charge of the area where the situation occurs." (See Exhibit "E" page #8-#9)

46. Assuming arguendo that I.D.O.C did not have policies prohibiting conduct reports against inmates who in good faith utilize the offender grievance process and Ndiaye or Adams believed Plaintiff was lying (though Plaintiff was not lying about Law Library staff or C/o Fowler refusing and/or failing to take his deadline legal mail) the I.D.O.C Adult Disciplinary Process Appendix I: Offenses, effective June 4, 2018 has a code C-350 "Lying to Anyone" that states, "Lying or providing a false statement" or code D-465 "Violating Facility Rule" which states "violating any facility rule regulation, or standing order if said rule, regulation, or standing order has been posted or otherwise communicated to the offender."

47. Instead Ndiaye choose a Major Conduct violation Code B-252 which carried three to four times the sanctions, including but not limited to three(3) months of loss of earned credit time and one grade reduction in credit class which neither are sanctions for a class "C" or "D" conduct report

48. Additionally if Ndiaye or Adams really believed the verbal informal complaint was frivilous either Ndiaye or Adams could have reported it to the facilities grievance specialists to be investigated under I.D.O.C policy 00-02-301 section IX. OFFENDER Abuse of Grievance Process which specifically sets out punishments for frivilous grievances

49. On September 11th, 2019 Plaintiff stated to Ndiaye, "How did I get a conduct report. I was using the informal grievance process and I did not lie, I did not come out to work, Fowler and Pentecost would not take my legal work, Cecil never came to my door and when I came out to get my commissary my hand never left my door. I told you personally I had deadline legal work to turn in you ordered me to lock back in my cell which I immediately did, That's four people that would not take my legal work so why did I get a conduct report." At that time Defendant Ndiaye looked directly at me and stated, "They came to your door you could have given it to them then, always you writing grievances and doing lawsuits you need to sit back and do your time." (See attached as Exhibit "F" First Sworn Affidavit of Ledon Taylor at paragraph #4)

50. Defendant Ndiaye and Adams' acts and omissions described in paragraph #25 - #49 were done because of Plaintiff previously exercising his 1st Amendment rights, These acts and omissions are sufficiently adverse to deter a person of ordinary firmness from exercising 1st Amendment rights in the future,

51. The negative job/work evaluation authored by Defendant Cecil described in paragraph #38 above was dated "9-6-2019" and in the comments section states, "Do to camera review for commisary (sic) he walked right by me and Ms. Pentecost talked to him at his Door. Lying (sic) to staff interfering with staff." In the recommendation section it states, "Reclass out of Lying (sic) and interfering (sic) with staff". In the attitude and traits section it states that Plaintiff is "violates" conduct, "resentful", "Easily led",

"Disruptive", initiative is "minimal", "inattentive", "volatile" temperament. In the Performance sections it states that Plaintiff has "minimal" interest in program, Quality of work is "sloppy", Quantity of work is "Lazy", Safety Habits are "careless", and "Constant" supervision required. The signature on the work evaluation says Misty M. Cecil, title of Library staff. (See Exhibit "D")

52. Approximately three hours after Plaintiff was finally permitted to turn in his legal mail inmate Pod Rep Campbell who as part of his job frequently transports classification paper work and other document to/from the Case Manager's Office for inmates to sign brought Plaintiff the work evaluation described in paragraph #51 above and Classification paperwork removing and/or firing/terminating Plaintiff from the M4 Law Clerk job.

53. Pursuant to I.D.O.C. Policy 02-01-106 (III)(G), Hartsock should have been assigned as "disciplinary hearing hold" which is the status or classification designed by the facility head "to temporarily hold or restrict an offender's access to a treatment or self-help program, a facility operational position or employment pending a disciplinary hearing."

54. Pursuant to I.D.O.C. Policy 02-01-106(XII)(J):
If Hartsock's case is "overturned on appeal" Hartsock "shall be returned to the previous assignment eligibility status as soon as possible and shall be given priority for a work assignment"

55. Plaintiff followed the appropriate I.D.O.C. policies trying to remedy the constitutional violation however Defendants Jennifer McGrath, Jennifer Smith, Shane Nelson, GEO and Mark Sevier turned a blind eye, failed to remedy the

page #14 of #27

violation after being informed of the violation through a report or appeal, created or allowed the continuation of a policy or custom under which unconstitutional practices occurred,

56. On September 12, 2019 Plaintiff received a response from Defendant McGrath hand delivered by Pod Rep Campbell stating, "There is an appeal process you can follow once you have been heard/sanctioned by CAB" (See Exhibit "G")

57. McGrath's acts and omissions described above Strongly suggest I was being found guilty before my hearing.

58. On Oct 3, 2019 Pod Rep Campbell brought a second negative work evaluation and classification paperwork terminating Plaintiff from the Law Clerk he was previously terminated from and never rehired for. This paperwork was authored by McGrath in an attempt to cover up the unconstitutional termination a month prior, as defendants are very aware of Plaintiff's litigation history.

59. The October 3, 2019 work evaluation recommended Plaintiff be "Remove[d] from job", the comments section stated, "Hartsock fails to meet facility standards when interacting with staff, becoming confrontational at times when given direct orders that he disagrees with. This behavior has become unmanageable (sic) and unacceptable to Unit Team Staff." (See Exhibit "H")

60. Oxford American Dictionary (2008) page #163, ISBN 978-0-19-530163-2 defines confrontational as an adjective and the noun being confrontation defined as, "a situation of angry disagreement or opposition"

61. Defendant McGrath knows that is a false or

page #15 of #27

untrue statement to call or document Plaintiff as "confrontational." Plaintiff's never yells, curses at or display derogatory comments towards staff and McGrath has never seen me be "confrontational" as opposed to having a "discussion" with staff. GOD requires Plaintiff to love everyone.

62. Both Plaintiff and Pod Rep Campbell have requested McGrath provide any instance in which she has observed Plaintiff being "confrontational" with staff as opposed to just having a "discussion". Of the seven (7) times McGrath has been asked both verbally and in writing McGrath can not identity any incident.

63. Both Cecil and McGrath Knowing published and spoke false statements about Plaintiff to third parties resulting in the loss of Plaintiff's high paying job.

64. Cecil and McGrath violated Indiana's state tort laws of Libel and Slander

(ii) The Disciplinary Review Process

65. "[T]he mere potential threat of disciplinary sanctions is sufficiently adverse action to support a claim of retaliation." Scott v. Churchill, 377 F. 3d 565, 572 (6th Cir. 2004)

66. Pursuant to I.D.O.C. policy 02-04-101 (VIII)(4)(d), "a guilty finding can result in demotion in credit class and/or deprivation of earned credit time, recommendation for transfer to higher security level (if charged with a class A or B violation) and/or an order for restitution."

67. Pursuant to I.D.O.C. policy 02-04-101 (VIII)(A) requires a Disciplinary Review Officer to "review the contents of each Report of Conduct" and "consult with the report writer's immediate Supervisor

as needed; change offense, title and code number (the DRO may change the offense to an equal or lesser offense; however, the offense may not be upgraded)... The DRO may return the Report of Conduct to the reporting staff person's immediate supervisor with an explaination for the return and a determination as to resubmission" as well as "Approve or disapprove the final report" and "Assign a case number to the Report of Conduct."

68. On September 16, 2019 Rutledge and September 18, 2019 A. Petty were the Disciplinary Review Officers tasked with performing the duties described in paragraph #67 above and paragraphs #69 - #74 below. Both Rutledge and A. Petty signed the screening reports indicating their approval to process the relevant conduct report for case #NCN-19-09-0027. Both Rutledge and A. Petty failed in their duty to protect Plaintiff from 1st Amendment retaliation when given the opportunity.

69. Pursuant to I.D.O.C policy 02-04-10((II)(0)(2) "Charged offenders may request that staff or other offender witness testimony be presented at the disciplinary hearing. (1) Witnesses who are not staff or other offenders shall not be permitted to attend the hearing. (2) offenders shall be permitted to present in-person testimony at the hearing from no more than two witnesses, unless the hearing officer determines that special circumstances exist which would indicate the additional in-person testimony is appropriate...d. An offender may request a witness at the time of screening by advising the Disciplinary Review Officer of the request for a witness or a witness statement...h. Witnesses notified by State Form 35447 shall be

required to provide testimony to the Hearing Officer either in person or by Witness statement."

70. During the September 16, 2019 review by Rutledge described in paragraph #68 above when plaintiff requested each of his witnesses provide in-person testimony Rutledge falsely stated, "that is not allowed." Plaintiff informed Rutledge that, "if you are infering that this prison has a blanket policy prohibiting live testimony that would violate I.D.O.C. policy, as well as my due process rights under the Seventh Circuit's Forbes vs. Trigg." Rutledge then stated to Plaintiff, "If you are going to be disruptive then I will end the screening." Plaintiff then stated, "I'm sorry I am not being disruptive I'm just not understanding what you are saying I only asked for live witnesses which is permitted under I.D.O.C. policy and only the hearing officer can state why it would not be allowed. You stated to me 'that is not allowed' and I was seeking clarification as to what you meant 'that is not allowed'. Rutledge then stated, "We just don't allow live testimony only written." Plaintiff then stated to Rutledge in a very polite mellow tone, "Would you please at least write down that I requested it and either you are officially denying the request or allow the Disciplinary Hearing officer conducting my Hearing to determine that." At that time Rutledge stated, "This screening is over you are being disruptive." (See Exhibit "I")

71. Rutledge falsely stated live witnesses were not allowed at this prison, to Plaintiff.

72. Rutledge acts and omissions described in

page #18 of #27

paragraphs #68-#71 above because of Plaintiff previously exercising his 1st Amendment rights. These acts and omissions are sufficiently adverse to deter a person of ordinary firmness from exercising 1st Amendment rights in the future.

73. On September 18,2019 a second screening for the relevant conduct report was held by A. Petty. Plaintiff again requested live in-person witnesses for all of witnesses which A. Petty noted and contrary to Rutledge's statements (See Exhibit "J")

74. None of Plaintiff's requested witnesses were ever notified per IDOC policy 02-04-101 by State form 35447 that Plaintiff requested their testimony. Their in-person live testimony were not summarized or documented at the Disciplinary hearing truthfully. (Note: This will be a key factor below when the Hearing officer falsely wrote a witness made a statement he did NOT make.)

75. On September 25,2019 Plaintiff had his Disciplinary hearing for case number NCN 19-09-0027 for the relevant conduct report. T. Thompson found Plaintiff guilty with sanctions of thirty days loss of earned credit time, loss of phone, and loss of commissary. The guilty finding included an additional punishment that prevented Plaintiff from being allowed to participate in I.D.O.C.'s special order via Union Supply Direct.

76. During the hearing described in paragraph #75 above Plaintiff stated to T. Thompson, "I.D.O.C policy 00-02-301 prohibits reprisal against an offender for using the informal grievance process including conduct reports like the one I am being charged with. Part of Ndiaye's job is to investigate inmate complaints I have no control of when he

Page #19  of #27

investigates my complaint. No inmate could ever know when a staff member is going to investigate. My statements to Ndiaye were protected by the 1st Amendment and IDOC policy. I did not lie to Ndiaye and all three of my witnesses will verify I asked Ms. Pentecost, Cecil, Fowler, and Ndiaye, to turn in my legal mail. They were at my cell door but they would not take it they said "cecil would get it later" and "Library Staff did not come back to my cell to get my legal mail. This is a vague charge because no inmate could ever know when a supervisor is going to investigate an informal grievance when investigating informal grievances is part of a supervisors job. No one mandated that Ndiaye review the camera oR investigate my informal grievance during blood draw or cell clean up. It was a friday he had a whole weekend to investigate."

77. Thompson allegedly found Plaintiff guilty of NCN-19-09-0027 stating in the "reason for decision" section, "Live witness Campbell Kevin M4-116, Bell, Robert M4-214, Kidd, Steven M4-215 Based on Cond. Report, evidence, offender and witness statement witness campbell stated Library Staff did go back to Hartsock's cell door - Guilty - Sgt. Ndiaye had to stop supervising blood draws and cell clean up." (See Exhibit "K")

78. Inmate Witness Kevin Campbell I.D.O.C.#_____, never stated to T. Thompson, "Library staff did go back to Hartsock's cell door." Kevin Campbell is willing to testify to that fact as well.

79. When T. Thompson asked Plaintiff to step out of the hearing & Prior to guilty finding, for a few minutes Thompson asked Ndiaye the author of the conduct report to enter the room and speak with Thompson. Plaintiff heard Thompson and Ndiaye

page #20 of #27

talking about "witness statements" in Plaintiff's case, when Plaintiff asked Thompson why was he "speaking to the author of [Plaintiff's] Conduct report" and if Plaintiff was, "going to be told anything about what was said between the two About this case". Thompson stated "No" then he stated, "I am finding you guilty. I am not finding you guilty because I think you lied in your Complaint to Ndiaye". Plaintiff then stated to Thompson, "Just to be clear you are aware it is a violation of my 1st Amendment right and prohibited by IDOC policy to punish me for a informal complaint to Ndiaye, It is against the law." Thompson stated to Plaintiff, "Then it will get over turned". Thompson failed in his duty to protect Plaintiff from punishment or risk of punishment for exercising his 1st Amendment right about conditions of confinement. Thompsons acts and omissions described herein were done because of Plaintiff previously exercising his first amendment rights. These acts and omissions are sufficiently adverse to deter a person of ordinary firmness from exercising their 1st Amendment rights in the future.

80. Evidence shown to the fact finder but concealed from the accused would not comport with the due process standards of Wolff v. McDonnell.

81. Thompson's sanctions of 30 days loss of earned credit time, 30 days loss of phone and commissary were later dismissed after I.D.O.C. dismissed the case. The only sanctions Plaintiff did not serve was the credit time. (See Exhibits "L" - "N")

82. Plaintiff followed the appropriate I.D.O.C policies (See Exhibit "O") trying to remedy the constitutional violations however Defendants GEO, Scott Fitch, Mark Sevier, and Roy Davis turned a blind eye, failed

to remedy the constitutional violation after being informed of the violation through a report or appeal, created or allowed the continuation of a policy or custom under which unconstitutional practices occurred, GEO fails to Train Employees About Their Legal Duties Of Avoiding Violations

83. Upon information and belief Defendant Scott Fitch as the Disciplinary Appeal Review for N.C.C.F. has a custom, policy or practice of not overturning or dismissing disciplinary cases alleging retaliation or due process violation, which allegation of the same exist, GEO Fails To Train Employees About Their Legal Duties To Avoid Violating Rights.

(c) Defendants Committed Intentional Infliction Of Emotional Distress

84. Defendants have committed the acts and omissions described in paragraphes #13-#83 above, that are truely extreme and outrageous.

85. Defendants knew or knew that their is at least a high probability that their conduct will cause severe emotional distress

86. Defendants acts and omissions described in paragraph #84-#85 above in fact caused severe emotional distress to Plaintiff,

87. Defendants have committed Intentional Infliction of Emotional Distress against Plaintiff in violation of Indiana law,

(D) GEO Has Breached It's Contract

88. The above paragraph #2 is incorporated herein as if restated in this paragraph,

89. Plaintiff is a third party beneficiary to the contract mentioned in paragraphes #2 and #88 above,

90. The contract mentioned in paragraphes #2, #88-#89 above requires GEO to follow all federal, state and local laws, rules, and

page #22 of #27

ordinances, and all provisions required thereby to be included herein in carrying out it's contractual obligations at N.C.C.F.

91. GEO has breached the contractual obligations mentioned in paragraph #90 above by violating the 1st, 8th, and 14th Amendments of the U.S. Constitution outlined in this Complaint above, also by violating Indiana state law against negligence, libel, slander, and intentional infliction of emotional distress outlined in this complaint above.

92. The breach of contract, complained about in paragraph #91 above has deprived Plaintiff of a high paying job, permanently put two false work evaluations on Plaintiff's prison record, prevented Plaintiff from receiving a prison job (and wages), humiliation, Intimidation, severe mental, emotional, and psychological injuries and other injuries including financial harm.

93. All defendants have acted with reckless disregard to Plaintiff's constitutional and statutory rights and have Knowingly, intentionally, and deliberately violated Plaintiff's 1st, 8th, and 14th Amendment rights in this case.

(E.) Hartsock's own continued 1st Amendment activity have no Bearing In This Case

94. Plaintiff's own actions have no bearing on his First Amendment retaliation claims, after defendants retaliation.

95. A 1st Amendment retaliation claim has an objective test of whether, "the retaliatory activies would 'deter a person of ordinary firmness' from exercising First Amendment activity in the future," Bridges v. Gilbert 557 F.3d 541,552 (7th Cir. 2001) (quoting Bart v.

Telford, 677 F.2d 622,625 (7th Cir. 1982) Plaintiff has extra-ordinary firmness as GOD commands him to be, infra,

96. The Third Circuit explained in Mirabella v. Villard, 853 F.3d 641, 650 (3d Cir. 2017) that "[t]here is good reason for such a rule: we will not reward government officials for picking on unusually hardy speakers. At the same time, we recognized that government officials should not be liable when the plaintiff is unreasonably weak-willed." Id. (quoting Bennet v. Hendrix 423 F.3d 1247, 1252 (11th Cir. 2005)

97. It substantially burdens Plaintiff's sincerely held religious beliefs as a Seventh Day Adventist as GOD commands Plaintiff, "that true disciples will face opposition for standing out from the crowd"(John 15:18) and "do not quench the Spirit. Do not despise prophecies. Test all things; hold fast what is good"(1 Thessalonians 5:19-21) "Strength to resist evil is best gained by aggressive service"(The Acts of the Apostles. p.105) "Whatever you do, do all to the glory of GOD"(1 Corinthians 10:31) "The World needs today what it needed nineteen hundred years ago - a revelation of Christ"(The Ministry of Healing, p.143)-when Defendants punish Plaintiff for it,

98. The State of Indiana and/or The GEO Group, Inc., receiver funds from the government of the United States,

99. The substantial burden complained about, supra, does not further a "compelling" governmental interest,

100. GEO's acts and omissions, supra, violate RLUIPA, 42 USC §2000-cc.

101. Sevier, Fitch, French, Fowler, Davis, Adams, Thompson, Petty, Rutledge, McGrath, Nelson, Ndiaye, Cecil and Pentecost acts and omissions

supra, violate Indiana's Religious Freedom Restoration Act (RFRA)
Indiana Code §§34-13-9 et seq.

## VIII. Jury Demand:

102. Plaintiff demands a trial by jury as to all so triable issues

## IX. Conclusion:

Plaintiff asks the Court to grant him the following relief:

103. A declaratory injunction declaring that defendants
acts or omissions are unconstitutional and/or illegal/unlawful.

104. A permanent injunction requiring defendants to
stop retaliating against Plaintiff for 1st Amendment activity and
remove or "expunge" the negative work evaluations in this case, and
return Plaintiff to the M4 Law Clerk job.

105. A permanent injunction requiring defendants to
adopt and implement a policy that would curb it's employees from
retaliating against prisoners for 1st Amendment activity.

106. Compensatory damages in an amount to be
determined by a jury.

107. Punitive damages in an amount to be determined
by a jury.

108. All cost of bringing and litigating this action.

109. All other relief the court deems just, proper,
and equitable in the premises.

Respectfully Submitted

Dated: 12-20-19
         mm/DD,/YY

Plaintiff, pro se
Joseph Hartsock #966460
New Castle Corr. Fac,
P.O. Box #A
New Castle, IN 47367

## VERIFICATION

I, Joseph Hartsock, have read the foregoing complaint and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those I believe them to be true. I certify under penalty of perjury, that the foregoing is true and correct

Declarant, Plaintiff
Joseph Hartsock #966460

page # 26 of #27

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this _20_ day of __December__, _2019_, the foregoing was filed with the Clerk of the United States District Court, Indianapolis Division.

I also certify that on this this _20_ day of __December__, _2019_, the foregoing was served by personally handing the same to the appropriate staff at the New Castle Correctional Facility to be placed in the facility's prison legal mail system and deposit in the United States mail, First-Class postage prepaid, upon:

        list names and addresses of:
        (1) Counsel of all defendants;
        (2) the United States District (Southern District) court clerk/administrative
            agency clerk;
        (3) the parties served as required by Rule 5. Service and filing of pleading and other
            papers.
        (4) any other persons required by statute.

### NAMES, TITLES, AND ADDRESSES SERVED

THE OFFICE OF THE
CLERK OF THE U.S. DISTRICT COURT
105 U.S. COURTHOUSE
46 EAST OHIO STREET
INDIANAPOLIS, INDIANA 46204

, IN 4

, IN 4

, IN 4

DATED: _12-20-19_

Respectfully Submitted,

_____
Plaintiff, pro se,
Joseph Hartsock (IDOC# 966460)
**NEW CASTLE CORRECTIONAL FACILITY**
Inmate Mail/Parcels
1000 Van Nuys Road
New Castle, IN 47362